IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

      Ryan 1000, LLC,                  Case No. 21-21326-beh

            Debtor.                  Chapter 11

In re:

      Ryan 8641, LLC,                  Case No. 21-21327-beh

            Debtor.                  Chapter 11

## DECISION AND ORDER DENYING (1) DEBTORS' APPLICATIONS TO EMPLOY COUNSEL AND (2) THE UNITED STATES TRUSTEE'S SECOND MOTIONS TO CONVERT

On May 18, 2021—more than two months after the debtors filed their Chapter 11 petitions—they filed applications seeking authorization to employ Strouse Law Offices as their counsel. The United States Trustee objected to the applications, asserting that employment was not in the best interest of the debtors' estates or interested parties. The U.S. Trustee also moved to convert these cases to Chapter 7 (for the second time), based on the debtors' unauthorized use of cash collateral. The debtors oppose conversion.

The Court held a consolidated hearing on the debtors' applications to employ counsel and the U.S. Trustee's motions to convert in both of these cases. Based on the record, and for the reasons that follow, the Court will deny the debtors' applications to employ, and deny the U.S. Trustee's motions to convert.

## BACKGROUND

### A.    The Ryans' Chapter 13 Bankruptcy

On January 17, 2018, David Paul Ryan and Jean Marie Ryan filed a
Chapter 13 petition, commencing Case No. 18-20366-gmh. Attorney Paul
Strouse, of Strouse Law Offices, represents the Ryans in their Chapter 13 case.
In their Schedule A/B, the Ryans listed as assets their ownership interest in
debtors Ryan 1000, LLC and Ryan 8641, LLC. The Ryans valued their 100%
ownership interest in Ryan 1000, LLC at $0, stating:

> A single real estate asset company. 1000 - 1018 West Pierce Street,
> Milwaukee, Wisconsin 53204. Based on the 2016 City of
> Milwaukee Real Property Tax Bill the property has an estimated
> fair market value of $180,700.00. The corporation owes on a
> mortgage with Waterstone Bank, SSB, secured on the property
> located at 1000-1018 West Pierce Street, Milwaukee, Wisconsin
> 53204. The principal balance owed on this mortgage on the date of
> filing was $200,850.90 . . . .

Case No. 18-20366-gmh, ECF No. 19, at 8; ECF No. 80, at 6.[1] The Ryans
valued their 100% ownership interest in Ryan 8641, LLC at $16,456.96, with a
similar explanation:

> A single real estate asset company. 8641 West Capitol Drive,
> Milwaukee, Wisconsin 53204. Based on the 2016 City of
> Milwaukee Real Property Tax Bill the property has an estimated
> fair market value of $164,700.00. When you subtract a 6.5%
> broker's fee and $5,000.00 in closing costs it leaves $149,995.00.
> The corporation owes on a mortgage with Waterstone Bank, SSB,
> secured on the property located at 8641 West Capitol Drive,
> Milwaukee, Wisconsin 53204. The principal balance owed on this
> mortgage on the date of filing was $133,538.04 . . . .

Case No. 18-20366-gmh, ECF No. 80, at 6. On their Schedule C, the Ryans
claimed as exempt their $0 interest in Ryan 1000, LLC, and $5,491.25 of their
interest in Ryan 8641, LLC. *Id.* at 12–13.

---

[1] To the extent any documents filed on the docket in the Ryans' Chapter 13 case were not
admitted into evidence in this case, the Court may take judicial notice of their contents. *In re
Lisse*, 905 F.3d 495, 496 (7th Cir. 2018); *see also Guaranty Bank v. Chubb Corp.*, 538 F.3d
587, 591 (7th Cir. 2008); *United States v. Doyle*, 121 F.3d 1078, 1088 (7th Cir. 1997).

The mortgage note between Ryan 1000, LLC and WaterStone Bank is signed by Mr. Ryan, both as managing member of Ryan 1000, LLC, and in his individual capacity. *See* Case No. 18-20366-gmh, Claim No. 13. The mortgage note between Ryan 8641, LLC and WaterStone Bank is signed by Mr. and Mrs. Ryan, both as members of Ryan 8641, LLC and in their individual capacities. *See* Case No. 18-20366-gmh, Claim No. 12. Nevertheless, in their Schedule E/F, the Ryans did not disclose any personal or contingent unsecured obligations owed to WaterStone Bank by virtue of the mortgage notes signed on behalf of Ryan 1000, LLC and Ryan 8641, LLC, and in their individual capacities,[2] nor did they identify Ryan 1000, LLC and Ryan 8641, LLC as creditors, despite the LLCs' rights of contribution against them.

The Ryans' Schedule I, as of January 28, 2019, disclosed that they were not employed and that they received total monthly income of $3,220.66—$2,166 in social security income, and $1,054.66 from operating four rental properties (including $456.47 in profits from Ryan 1000, LLC, and $284.19 in profits from Ryan 8641, LLC). *See* Case No. 18-20366-gmh, ECF Nos. 23 and 90. After expenses of $2,521.00, the Ryans reported net monthly income of $699.66. *Id.* In their Chapter 13 plan, the Ryans proposed making monthly payments to the Chapter 13 trustee in that same amount—$699—for 60 months, and paying unsecured creditors a dividend of $10,965.71 (the amount of the Ryans' non-exempt equity in Ryan 8641, LLC, which equates to roughly 48% of filed unsecured claims). The Ryans' plan was confirmed in March 2019. Case No. 18-20366-gmh, ECF No. 101.[3]

---

[2] The Ryans also objected to the secured proofs of claim WaterStone Bank filed in their Chapter 13 case in connection with the debts secured by the properties owned by Ryan 1000, LLC and Ryan 8641, LLC, asserting (incorrectly) that they were not personally responsible for the debts of the LLCs. *See* Case No. 18-20366-gmh, ECF Nos. 66 and 67. Before the Ryans' claim objections could be adjudicated, WaterStone Bank withdrew its secured claims. Case No. 18-20366-gmh, ECF Nos. 77 and 78.

[3] According to the terms of the plan, property of the estate does not revest in the Ryans until they receive their Chapter 13 discharge, meaning that any non-exempt equity in either Ryan 1000, LLC or Ryan 8641, LLC remains property of their Chapter 13 bankruptcy estate.

Just prior to plan confirmation, WaterStone Bank moved for relief from the automatic stay as to the real property owned by Ryan 1000, LLC and Ryan 8641, LLC, plus a third rental property owned by the Ryans, based on the LLCs' and the Ryans' delinquencies in post-petition mortgage payments. Case No. 18-20366-gmh, ECF No. 82. In March 2019, WaterStone's motion was granted in part and denied in part; the court's order included terms that modified the interest rates and payment terms on the three underlying notes, required the Ryans to make a payment of $5,000 to reduce the arrearages on all three notes, and required the Ryans to execute a cross-collateralization mortgage on the properties. *See* Case No. 18-20366-gmh, ECF No. 103. Ultimately, the Ryans defaulted under the terms of that order by failing to maintain insurance on the property owned by the LLCs, and the court granted WaterStone Bank relief from stay as to those two properties in June 2019. *See* Case No. 18-20366-gmh, ECF Nos. 114 and 117.

## B.   These Chapter 11 Bankruptcy Cases

On March 15, 2021, Attorney Strouse filed Chapter 11 petitions on behalf of Ryan 1000, LLC (commencing Case No. 21-21326-beh) and Ryan 8641, LLC (commencing Case No. 21-21327-beh). The debtors' bankruptcy petitions contained several errors:

- Although David and Jean Ryan are joint shareholders of the debtors, the debtors' petitions were signed by Mr. Ryan as "Sole Shareholder."

- Neither petition identified the pending and concurrently-filed bankruptcies of the debtor's affiliates (the Ryans and the other LLC).

- Each debtor listed its business as "single asset real estate" (SARE) within the meaning of 11 U.S.C. § 101(51B), and also identified itself as a "small business debtor" under 11 U.S.C. § 101(51D), but the two concepts are mutually exclusive.[4]

On March 24—after prompting from counsel for the U.S. Trustee— Attorney Strouse attempted to amend the petitions to remove the "small

---

[4] *See* 11 U.S.C. § 101(51D) ("The term 'small business debtor' . . . means a person engaged in commercial business activities . . . and excluding a person whose primary activity is the business of owning single asset real estate . . . .").

business debtor" designations, but mistakenly refiled the debtors' original petitions. On April 19, he filed corrected amendments (to select only the SARE designation), but these amendments still identified Mr. Ryan as the sole shareholder of the debtors, and did not disclose the bankruptcy cases of the debtors' affiliates. Further amendments to remedy these remaining deficiencies were filed on May 6, 2021.

In the debtors' schedules, filed on March 30, 2021, Ryan 1000, LLC valued its property at 1000–1018 West Pierce Street at $500,000, based on a "comparable sale," while Ryan 8641, LLC valued its property at 8641 West Capitol Drive at $275,000, using the same valuation method. The debtors' schedules did not identify either Mr. or Mrs. Ryan as codebtors on the WaterStone Bank notes.

On April 1, 2021, the United States Trustee moved to convert the debtors' cases to Chapter 7, after learning that neither debtor had property or liability insurance in place for its real estate (aside from force-placed property insurance purchased by WaterStone Bank). *See* 11 U.S.C. § 1112(b)(4)(C). At an expedited hearing on April 20, 2021, Attorney Strouse reported that the debtors had purchased property and liability insurance just prior to the hearing. As a result, the Court denied the U.S. Trustee's motions on the condition that the debtors provide proof of insurance by the close of business on April 21, which they did.[5]

On May 10, the U.S. Trustee again moved to convert these cases to Chapter 7, this time based on the debtors' unauthorized use of WaterStone Bank's cash collateral (the rents collected from their properties). *See* 11 U.S.C. § 1112(b)(4)(D). According to the U.S. Trustee's second motions to convert, the debtors had been using their post-petition rent for various purposes (including paying for repairs and insurance) during the eight weeks they had been in

---

[5] Although not a condition of the Court's order, the insurance certificates did not name the United States Trustee as co-certificate holder, and the debtors had to correct the certificates.

bankruptcy, without seeking permission from WaterStone Bank or authority from the Court to do so.[6]

The debtors filed motions seeking authority to use WaterStone Bank's cash collateral (to which the bank agreed, and the Court later granted) on May 18. On that same date, the debtors also filed applications to employ Strouse Law Offices. The applications and the accompanying documents contain a number of mistakes:

- The applications seek to employ Strouse Law Offices as "general counsel" rather than bankruptcy counsel.

- The applications are signed by Attorney Paul A. Strouse, rather than each debtor-in-possession.

- The applications do not state whether Strouse Law Offices seeks to have compensation limited as provided in 11 U.S.C. § 328 (though section 328 is mentioned in the proposed orders), nor whether Strouse Law Offices is willing to have any request for fees reviewed under section 330(a)'s compensation standards. *See* L.R. 2014(a) ("If the applicant seeks to have compensation limited as provided in 11 U.S.C. § 328, then the applicant must specifically request in the application that the court approve the employment subject to § 328, and the application also must state whether the applicant is willing to have any request for fees reviewed under 11 U.S.C. § 330(a)'s compensation standards.").

- The proposed orders do not set forth the proposed terms of employment and method of calculating the compensation. *See* L.R. 2014(b) ("An application for authorization to employ a professional under 11 U.S.C. §§ 327 or 1103 must be accompanied by a proposed order that describes the proposed terms of employment and method of calculating compensation without incorporating the application's terms by reference.").

- The applications state that the debtors want to employ Strouse Law Offices under general retainers, but do not state that retainers were paid in both cases, while the debtors' disclosures of compensation required by Federal Rule of Bankruptcy Procedure 2016(b) (Form B 2030) state that

---

[6] The debtors ultimately objected to the motions on June 1, each responding: "The Debtor has now filed all necessary motions, amendments and reports and has provided the United State's [sic] Trustee with all necessary documentation, or is about to provide it, that will allow the Debtor to organize it's [sic] debts into effective plan o[f] reorganization."

Strouse Law Offices agreed to accept $4,000 for legal services, and that the fee was paid by the debtors in full prior to the petition date.[7]

Most problematic, however, are omissions from the declarations Attorney Strouse filed in support of the applications. In each declaration, Attorney Strouse certifies "that I have no adverse interest to the Debtor, that I have no claim against the Debtor for any other representation, and that I am not a creditor in the Debtor's bankruptcy proceeding filed on April 13, 2013 [sic]. Furthermore, the Debtor does not owe my office any sum of money." The declarations do not disclose that Attorney Strouse represents the Ryans, each a 50% owner of the debtors, in their pending Chapter 13 case; that the Ryans derive their income, in part, from the debtors and depend on that income in funding their Chapter 13 plan; that Mr. Ryan is a co-obligor with Ryan 1000, LLC on its debt to WaterStone Bank; and that Mr. and Mrs. Ryan are co-obligors with Ryan 8641, LLC on its debt to WaterStone Bank. *See* Fed. R. Bankr. P. 2014(a) (requiring an application for employment to be accompanied by a verified statement of the person to be employed "setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee").

The U.S. Trustee objected to the debtors' applications to employ. Aside from the problems outlined above, the U.S. Trustee points to the debtors' delinquent and inaccurate monthly operating reports and instances of Attorney Strouse's non-responsiveness to requests from the U.S. Trustee's office, as well as delays in providing financial records and other documentation. The U.S. Trustee further questions Attorney Strouse's competency to effectively

---

[7] In addition, each debtor's Form B 2030 lists services that are included in the fee charged and services that are not included, but the disclosures appear to be boilerplate clauses that pertain to Chapter 7 or Chapter 13 work and should not be included in a Chapter 11 case. For example, work covered by the fee includes "exemption planning; preparation and filing of reaffirmation agreements and applications as needed; [and] preparation and filing of motions pursuant to 11 USC 522(f)(2)(A) for avoidance of liens on household goods," while excluded tasks include "[r]epresentation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding."

represent debtors in Chapter 11 cases, observing that, while Strouse "may have extensive experience representing debtors in Chapter 7 and 13, he has never filed a Chapter 11 case and has no experience with Chapter 11 proceedings," nor does he have "a seasoned Chapter 11 mentor to help advise [him]."

The Court held a consolidated hearing to consider the U.S. Trustee's objections to the employment applications and the U.S. Trustee's second motions to convert on June 8, 2021, and continued the hearing on June 23, 2021. The Court heard testimony from David Ryan, Rebecca Garcia (the Chapter 13 trustee in the Ryans' bankruptcy case), and William Bruss (counsel for WaterStone Bank). The testimony and exhibits established the following facts:

- From May 2020 until shortly after filing these cases, the debtors operated on a cash basis and did not hold bank accounts. The debtors collected rent via cash or money order, which Mr. Ryan kept in a desk drawer, and the debtors tracked their expenses through receipts. Prior to May 2020, the debtors paid their expenses via check.

- One of those expenses was rent for the building where the debtors maintain offices, at 5834–36 West Lisbon Avenue in Milwaukee. David and Jean Ryan own this real estate personally. Up until December 2020, each debtor was paying half of the $460 monthly mortgage on the West Lisbon office property. In December 2020, the Ryans redeemed the West Lisbon property from a foreclosure judgment obtained by WaterStone Bank. Neither debtor had made its own mortgage payments to WaterStone Bank since June or July 2020, and the debtors filed these cases shortly before the scheduled foreclosure sales of their respective real estate.

- Ryan 1000, LLC has an on-site manager who lives at the Pierce Street property, and who was responsible for collecting rent and keeping track of petty cash prepetition. Part of the reason the debtors were unable to provide their historical financial information to the U.S. Trustee by the original deadline was that the manager had been unavailable to assist with compiling the information until early June 2021.

- Neither debtor had filed a tax return since around 2000 or 2001. According to Mr. Ryan, this was because the debtors have operated at a

loss every year since then.[8] Mr. Ryan has not spoken to an accountant to determine whether the debtors are required to file tax returns, and the Ryans do not file personal tax returns.

- Neither debtor has ever prepared a profit and loss statement or a balance sheet, or kept track of financial data in an accounting software program like QuickBooks. Per Mr. Ryan, "[i]t was knowing what I was spending, knowing what was coming in, knowing who I had to chase down."

- Mr. Ryan conceded that the debtors likely would need to hire accountants if these cases proceed under Chapter 11.

- WaterStone Bank has a lien on the debtors' post-petition rents by virtue of an assignment-of-rent clause in its mortgages, and the rents constitute WaterStone Bank's cash collateral.

- Both debtors used WaterStone Bank's cash collateral from the time of their March 15 bankruptcy filings through at least April 2021, without authorization from either the bank or the Court, to pay for expenses including insurance and repairs.

- When the debtors filed for bankruptcy, Mr. Ryan did not understand that the debtors' post-petition rents belonged to WaterStone Bank, and instead believed that they belonged to the buildings. He did not seek permission from WaterStone Bank before using its cash collateral because he was not aware that he needed to.

- Mr. Bruss testified that the debtors' unauthorized use of WaterStone Bank's cash collateral harmed the bank because the debtors' liabilities to the bank continued to increase, and the bank had no idea how its cash collateral was being used (or whether the use was to improve the collateral, or for other purposes that did not benefit the bank).

- Ryan 1000, LLC's goal in its Chapter 11 case is to sell its real estate and realize what Mr. Ryan believes is substantial equity in the property (approximately $250,000). Mr. Ryan believes that the proceeds will be sufficient to pay off all of Ryan 1000, LLC's claims (only two, totaling approximately $248,000, both of which are secured by the real estate), plus the claims of Ryan 8641, LLC (also only two secured claims, totaling

---

[8] Mr. Ryan's testimony that he has had to put money into each debtor every year calls into question the budget he filed in his Chapter 13 case, in which the Ryans calculated their net monthly income based on the expectation of receiving monthly profits of almost $750 from the debtors. This testimony also conflicts with the statement of current monthly income (Form 122C-1) that the Ryans filed in their Chapter 13 case, in which they reported receiving average net monthly income from the debtors during the months of July through December 2017 of $282.54 ($209.93/month from Ryan 1000 and $72.61/month from Ryan 8641). *See* Case No. 18-20366-gmh, ECF No. 19, at 51, 54.

approximately $155,000). If the proceeds from the sale of Ryan 1000, LLC's property are not sufficient to pay off the claims of Ryan 8641, LLC's creditors, Ryan 8641, LLC plans to refinance its debt.

- Mr. Ryan came up with the $500,000 valuation of Ryan 1000, LLC's property with the help of his brother, who has a degree in accounting, based in part on the amount of rent the property currently garners (with most units being charged $750/month). Mr. Ryan added that the location is in a desirable area, and "people have told him" he should raise the rent to $900/month.

- Mr. Ryan also has spoken with a real estate agent about selling Ryan 1000, LLC's building—although the debtor has not yet filed an application to employ a broker—and plans to list the property at $575,000. Based on his conversations with the real estate agent, Mr. Ryan anticipates the property will not last longer than a week in this "hot" market. He does not want the property to be sold in a Chapter 7 liquidation because he believes the Chapter 7 process would result in a "fire sale."

- In the monthly operating reports filed in these cases, Ryan 1000, LLC projects that it will receive $5,900 in rental income each month (assuming all tenants pay) and will have average expenses of $1,330, resulting in net monthly income of $3,295. Ryan 8641, LLC projects monthly rental income of $3,945 and expenses of $1,186, resulting in net monthly income of $2,666.

- The May 2021 operating report filed by Ryan 1000, LLC reflects monthly income of $2,275.00, monthly expenses of $1,435.13, a net profit of $839.87, and an ending cash balance of $1,623.24. The May 2021 operating report filed by Ryan 8641, LLC reflects monthly income of $4,470, monthly expenses of $927.47, a net profit of $3,542.53, and an ending cash balance of $5,747.89.

- According to Ms. Garcia, if Ryan 1000, LLC is able to sell its property at the anticipated price, or if the debtors' projections of future net monthly income are accurate, the resulting increase in the Ryans' disposable income would be significant enough to warrant an increase in the Ryans' Chapter 13 plan payments, and Ms. Garcia likely would move to modify their Chapter 13 plan to provide for payment of 100% of their unsecured claims.

- Ms. Garcia favors conversion over dismissal, because the sale of the property owned by Ryan 1000, LLC would be overseen by a Chapter 7 trustee, who would ensure an orderly disposition of the assets and account for (and disclose) the receipt and disbursement of all funds.

- WaterStone Bank also favors conversion over dismissal. Mr. Bruss testified that the bank is interested in getting paid as soon as possible. The risk of dismissal is that a subsequent bankruptcy filing would thwart the bank's efforts to proceed with its foreclosure sales (which would require approximately 6 weeks to accomplish). A Chapter 7 liquidation would provide a more certain and prompt outcome.

At the close of evidence, the parties renewed the arguments set forth in their written submissions to the Court. Counsel for the U.S. Trustee also advanced two additional reasons why Attorney Strouse should be disqualified from representing the debtors: (1) his representation of the Ryans individually in their Chapter 13 case creates a conflict of interest (counsel did not elaborate on the substance of the conflict created by the dual representation based on the specific facts of these cases), and (2) Attorney Strouse failed to disclose his representation of the Ryans, as required by Bankruptcy Rule 2014.[9]

## ANALYSIS

### A.    The Debtors' Applications to Employ

Employment of professionals is governed by section 327 of the Bankruptcy Code. It permits a trustee (or Chapter 11 debtor-in-possession),[10] "with the court's approval," to employ one or more professional persons— including attorneys—"that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). By requiring court approval of employment, the Code gives bankruptcy courts broad discretion over the appointment of professionals. *In re Vettori*, 217 B.R. 242, 244 (Bankr. N.D. Ill. 1998) ("Bankruptcy Judges have broad discretion

---

[9] The U.S. Trustee did not raise these arguments in his written objections, apparently because counsel for the U.S. Trustee overlooked the debtors' additional disclosures of the Ryans' pending Chapter 13 case in their May 6 amended petitions, and was otherwise unaware of the existence of the Ryans' case. At the June 8, 2021 hearing, counsel for the U.S. Trustee informed the Court that Mr. Ryan had never disclosed his Chapter 13 case at any of the debtors' several section 341 meetings, and, had she known about the case, should would have mentioned the conflict of interest and lack of disclosure in the U.S. Trustee's written objections.

[10] Section 327 applies to debtors-in-possession by virtue of 11 U.S.C. § 1107(a), which provides that a debtor-in-possession has all of the rights, duties, and obligations of a trustee.

over the appointment of such professionals. . . . The ultimate determination as to whether appointment of an attorney should be approved falls within the sound discretion of the court.") (internal citations omitted); *Harold & Williams Development Co. v. U.S. Trustee (In re Harold & Williams Dev. Co.)*, 977 F.2d 906, 909 (4th Cir. 1992) ("Although the Code vests in the bankruptcy trustee the immediate power to select candidates for employment by the bankruptcy estate, it gives broad discretion to the bankruptcy court over the appointment of professionals to work on behalf of the trustee and the estate, in part by empowering the court to approve candidates so selected.").

Even so, that discretion is not unfettered. Congress has established some *per se* rules that courts must apply in deciding whether to approve the appointment of professionals. Section 327(a) prohibits the court from approving the appointment of a professional who is not a "disinterested person," or who holds or represents "an interest adverse to the estate." *See also* 11 U.S.C. § 327(c) (the court may approve employment of a professional who also represents a creditor of the estate over the objection of a creditor or the U.S. Trustee only if there is no "actual conflict of interest"). "Together, the statutory requirements of disinterestedness and no interest adverse to the estate 'serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'" *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir. 1998) (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994)).

A "disinterested person" means a person that "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C). The Seventh Circuit has read the phrase "for any other reason" (referred to as the "catch-all clause") as "sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the

independence and impartial attitude required by the Code.'" *Crivello*, 134 F.3d at 835 (quoting *In re BH & P, Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991)).

And while the Code does not specify what constitutes "an interest adverse to the estate," the Seventh Circuit has construed the term to include "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant" or "a predisposition under circumstances that render such a bias against the estate." *Id.* at 835 (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985)).

An attorney's simultaneous representation of a debtor and its owner, by itself, is not sufficient to create a conflict of interest that would bar employment under section 327(a). *See In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 846–47 (Bankr. S.D. Ill. 1993) ("[S]imultaneous representation of the debtor and its controlling shareholder may be permissible.") (citing *In re Plaza Hotel Corp.,* 111 B.R. 882, 890 (Bankr. E.D. Cal.), *aff'd,* 123 B.R. 466 (9th Cir. BAP 1990) (simultaneous representation of a debtor and its controlling shareholder "although not a disqualifying conflict per se, becomes a basis to disqualify counsel when adverse interests either exist or are likely to develop")); *In re Raymond Pro. Grp., Inc.*, 421 B.R. 891, 902–03 (Bankr. N.D. Ill. 2009) (although a bankruptcy judge can disapprove of the employment of professionals with a potential—rather than actual—conflict, there are two possible situations where that would not be a proper decision: "(1) large cases where every competent professional in a particular field is already employed by a creditor or a party in interest and (2) where the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling.") (internal quotation marks omitted).

Bankruptcy Rule 2014(a) "facilitates enforcement of section 327(a) by requiring that professionals seeking to represent the trustee in a bankruptcy proceeding submit a verification that fully and broadly discloses 'the person's connections with the debtor, creditors, [or] any other party in interest,' among others." *In re Knight-Celotex, LLC*, 695 F.3d 714, 722 (7th Cir. 2012). The

"connections" that must be disclosed under Rule 2014 are "considerably broader" than the disclosures required under section 327(a). *In re Rental Sys., L.L.C.*, 511 B.R. 882, 894 (Bankr. N.D. Ill. 2014). This means that an attorney "must disclose a connection even if he does not believe it would disqualify him under Section 327(a)." *In re Gluth Bros. Const., Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011).

The disclosures under Rule 2014 must be full and candid; "[c]oy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Pope*, No. 20-22889-GMH, 2021 WL 1346528, at *4 (Bankr. E.D. Wis. Mar. 31, 2021) (quoting *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 662 (Bankr. N.D. Ill. 2001)) (internal quotation marks omitted). Nor is compliance with Rule 2014's disclosure requirements excused by disclosure elsewhere in the record. *Id.* (citing *Gluth Bros.*, 459 B.R. at 364 ("It is not sufficient that connections are disclosed in other pleadings, such as a statement of financial affairs, or at a 341 meeting.")). "The burden of disclosure is placed on the applicant to produce the relevant facts, rather than relying on the bankruptcy judge or parties in interest to conduct an independent factual investigation to determine whether the applicant has a conflict." *Raymond Pro. Grp.*, 421 B.R. at 906; *accord Crivello*, 134 F.3d at 839 ("Bankruptcy courts have neither the resources nor the time to investigate the veracity of the information submitted in [retention and compensation] statements and affidavits and to root out the existence of undisclosed conflicts of interest"). An attorney who fails to disclose all connections required by Rule 2014 risks disqualification. *Pope*, 2021 WL 1346528, at *5; *see also Crivello*, 134 F.3d at 836 ("[C]ounsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.").

In summary, a debtor-in-possession first must demonstrate that the applicant for professional employment meets the threshold requirements of section 327 (being disinterested and having no interest adverse to the estate), through the disclosures required under Rule 2014. Once the applicant has

proven these minimum qualifications, the bankruptcy court then must exercise its discretion "in a way that it believes best serves the objectives of the bankruptcy system" in deciding whether to approve the employment, considering "the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding." *Harold & Williams Dev. Co.*, 977 F.2d at 910. *See also Vettori*, 217 B.R. at 245 ("a professional should only be appointed where the appointment will aid in the administration of the proceeding" and "the appointment must be in the best interest of the estate").

The Court must deny the debtors' applications to employ Strouse Law Offices for two reasons. First, Attorney Strouse's simultaneous representation of the Ryans in their Chapter 13 case creates a conflict of interest—one which Attorney Strouse failed to disclose as required under Rule 2014. Second, at least on the record and at the present time, Attorney Strouse has not convinced the Court that he has the ability to adequately represent the debtors in these Chapter 11 cases and therefore that the appointment is in the best interest of the estates.

### 1. Conflict of Interest

Strouse's representation of the Ryans in their Chapter 13 bankruptcy case poses a conflict with his representation of the debtors in these cases. The Ryans are each a 50% owner of the debtors, and rely on income from the debtors to be able to fund their Chapter 13 plan.[11] Mr. Ryan is a co-obligor with Ryan 1000, LLC on its debt to WaterStone Bank and Mr. and Mrs. Ryan are co-obligors with Ryan 8641, LLC on its debt to WaterStone Bank—although Attorney Strouse apparently failed to appreciate this relationship, both when

---

[11] Although Mr. Ryan testified that neither of the debtors have made a profit since 2001, and that the Ryans do not use income from the debtors to fund their Chapter 13 plan, this representation is at odds with the numbers reflected in the Ryans' Chapter 13 budget, at least as of January 2019. At that time (a year into their Chapter 13 case), the Ryans reported that they received SSI income of $2,166, while their expenses totaled $2,521. In other words, the Ryans necessarily had to rely on the debtors' rental income to pay a portion of their personal expenses not covered by their social security income, and to enable them to make monthly plan payments of $699.

he filed the Ryans' case and then when he filed these debtors' petitions. The Ryans' schedules also indicate that they depend on the debtors to make payments on their joint obligations. When one co-obligor "pays more than a fair share of a common obligation," that co-obligor has a right of contribution against the other co-obligor for repayment. *Kafka v. Pope*, 194 Wis. 2d 234, 242–43, 533 N.W.2d 491, 494 (Wis. 1995) (explaining that the right to seek equitable contribution "is premised on two conditions: (1) the parties must be liable for the same obligation; and (2) the party seeking contribution must have paid more than a fair share of the obligation"); *see also Wait v. Pierce*, 191 Wis. 202, 210 N.W. 822, 823 (Wis. 1926) ("the thing that gives rise to the right of contribution is that one of the common obligors has discharged more than his fair equitable share of the common liability"). To the extent that Ryan 1000, LLC and Ryan 8641, LLC have paid more than their share of the liability on the WaterStone notes, they have a right of contribution against their co-obligors (Mr. Ryan, and both Mr. and Mrs. Ryan, respectively), which makes the debtors creditors of the Ryans.

A case with facts very similar to those at hand is *In re Wiley Brown & Assocs., LLC*, No. 06-50886, 2006 WL 2390290 (Bankr. M.D.N.C. Aug. 14, 2006).[12] In that case, the Chapter 11 debtor corporation was half-owned by an individual, Brown, who had filed his own Chapter 13 case almost two months before the debtor filed its petition. Brown, who was an officer and employee of the debtor, personally guaranteed the largest debts of the debtor. He also derived his income from the debtor, and depended on the debtor giving him an extra $6,000.00 per month with which to make his Chapter 13 plan payments. In addition, Brown relied on the debtor, his co-obligor, to make the payments on the debts he had guaranteed. 2006 WL 2390290, at *1–2.

The same attorney who represented Brown in his Chapter 13 case sought approval to be employed as bankruptcy counsel for the Chapter 11 debtor. The

---

[12] The U.S. Trustee cited the *Wiley Brown* case in support of his objections to the employment applications. Attorney Strouse offered no contrary case law, either on the docket, or orally.

bankruptcy court denied the application, concluding that the attorney's representation of Brown in his Chapter 13 case constituted a representation of an interest that was adverse to the Chapter 11 debtor's estate. *Id.* at *3–5. In doing so, the bankruptcy court found that the attorney's simultaneous representation of the debtor and its owner, of which the debtor was a creditor, posed an actual conflict of interest. *Id.* at *4–5 (citing, *inter alia*, *In re Big Mac Marine, Inc.,* 326 B.R. 150, 153 (8th Cir. B.A.P. 2005) (attorney could not represent debtor and principals of debtor who were also creditors of debtor); *In re Plaza Hotel Corp.*, 123 B.R. 466, 469 (9th Cir. B.A.P. 1990) (attorney precluded from representing debtor when he was already representing debtor's owners and guarantors in a state court proceeding); *In re McGregory,* 340 B.R. 915, 920 (8th Cir. B.A.P. 2006) (conflict of interest arose where an attorney represented debtor and participated in debtor's refinancing transaction as both counsel for debtor and an agent of lender); *In re Lehtinen,* 322 B.R. 404, 408 (9th Cir. B.A.P. 2005) (it is a conflict of interest for an attorney to represent debtor in a Chapter 13 case and to represent a broker in connection with the sale of debtor's home); *In re Coal River Resources, Inc.,* 321 B.R. 184, 187–188 (W.D. Va. 2005) (law firm could not represent four separate corporate debtors, all of which were owned by one individual, and some or all of which were creditors of one another; court concluded that "to represent . . . a debtor-in-possession which is a material debtor of another [debtor] is inherently to 'represent an interest adverse' to the latter's estate")).

In addition, Mr. Ryan's testimony at the June 8 hearing suggests that both of the debtors made a number of prepetition payments for the benefit of the Ryans within the year before filing—payments that are not disclosed in the debtors' statements of financial affairs[13]—which could be subject to attack as preferential or fraudulent transfers. Up until December 2020, each debtor was

---

[13] Question 30 of the debtors' statement of financial affairs (Form 207) requires disclosure of any payments given to insiders, asking: "Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?" Both debtors answered "no" to this question.

paying half of the $460 monthly mortgage on real property owned by the Ryans personally, which the Ryans then redeemed from a foreclosure judgment (presumably with funds derived from the debtors' rental income). And while the debtors were shortchanging their *own* creditors and defaulting on their mortgage payments to WaterStone Bank, the Ryans were using profits from the debtors to enable them to make plan payments to *their* creditors.

Conversely, the Ryans' unsecured creditors now stand to be shortchanged if Ryan 1000, LLC is successful in selling its real estate at the intended price, which would increase the Ryans' nonexempt equity in Ryan 1000, LLC (equity that remains property of their Chapter 13 bankruptcy estate) by approximately $250,000. Such a sale would generate extra disposable income sufficient for the Ryans to pay all unsecured claims in full, but their current Chapter 13 plan provides for a distribution to unsecured creditors of only 48%.

Attorney Strouse suggested at the hearing that any dilemmas created by the competing interests in the proceeds of the sale of Ryan 1000, LLC's real estate could be addressed by modifying the Ryans' Chapter 13 plan to provide a 100% distribution to unsecured creditors and to require that any net proceeds of the real estate sale be used to pay off the remaining balance of the claims. While potentially a viable solution—Ms. Garcia did not raise any objections to this course of action—Attorney Strouse's failure to anticipate and account for this potential conflict is symptomatic of a larger problem, one best exemplified by his failure to satisfy the disclosure obligations of Rule 2014(a). *Cf. Matter of Atlanta Sporting Club*, 137 B.R. 550, 553 (Bankr. N.D. Ga. 1991) ("When an attorney fails to disclose relationships and facts necessary for the Court to make a determination as to whether they meet the requirements of the Code, three explanations may be inferred: oversight or negligence, failure to understand the importance of proper disclosure, or an intent to circumvent the Code."). The Court does not believe that Attorney Strouse deliberately tried to evade the disclosure requirements of Rule 2014, but his conduct demonstrates a lack of understanding of the applicable sections of the Code and Bankruptcy

Rules, his obligations in this case, and the separate interests of the Ryans and the debtors.

Although Attorney Strouse's failure to meet his disclosure obligations under Rule 2014 does not, by itself, dictate denial of the applications, the outcome is warranted based on the circumstances of these cases. *Cf. Granite Sheet Metal Works*, 159 B.R. at 847 ("Failure to comply with the disclosure requirements of Rule 2014(a) is, by itself, enough to disqualify an attorney and deny compensation."); *Raymond Pro. Grp.*, 421 B.R. at 906 ("In the most extreme application of Rule 2014, it has been said that denial of fees or disqualification may be justified even when the professional is in fact disinterested.") (citing *In re Midway Indus. Contractors,* 272 B.R. 651, 662 (Bankr. N.D. Ill. 2001)). Whether the conflict at issue here is "actual" or merely "potential"—a determination the Court is not equipped to make on the present record, due in part to the lack of information about the debtors' prepetition financial dealings (a fault attributable to the debtors and their poor recordkeeping practices) and the early status of these cases in which the debtors have not yet filed plans—the conflict is real enough to merit denial of the application. *See Raymond Pro. Grp.*, 421 B.R. at 902 (a conflict is "actual" when "the professional serves two presently competing and adverse interests," while a conflict is merely "potential" when "the competition does not presently exist, but may become active if certain contingencies arise"; it is appropriate for a court to disapprove employment based on a potential conflict, unless (1) the case is large and all competent professionals are already employed, or (2) "the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling").

The Court recognizes that a contrary decision would be within its discretion, but the compounding factors discussed below militate against such a result. *Compare In re Jade Mgmt. Servs.*, 386 F. App'x 145, 149 (3d Cir. 2010) (bankruptcy court did not abuse its discretion in approving debtor's employment of attorney who simultaneously represented the debtor's sole

shareholder and guarantor of the debtor's secured debt, based on its determination that there was only a remote possibility the potential conflict of interest would ever ripen into actual conflict; the value of the debtor's assets exceeded the value of the secured claims the shareholder had guaranteed and the debtor's plan feasibly proposed satisfying all secured claims in full, "thereby diminishing or eliminating outright any potential tension between [the shareholder] and the secured creditors" and making it likely that the shareholder would never be called upon to satisfy her guarantees).

### 2. Competence of Counsel

Even if Attorney Strouse's simultaneous representation of the Ryans and the debtors did not create a conflict of interest, the Court also must deny the applications for a second reason: Attorney Strouse has failed to demonstrate the requisite competence and care required to represent these Chapter 11 debtors' estates, at least at this point in time.

As indicated above, once a professional has demonstrated the minimum requirements for employment under section 327, the Court still must exercise its discretion in deciding whether to approve that employment as best serving the objectives of the bankruptcy system. The U.S. Trustee urges the Court to deny the applications, asserting that employment of Strouse Law Offices is not in the best interests of the debtors or their creditors, pointing to "[t]he lack of experience, the disregard of statutes, rules, deadlines, the numerous administrative issues, and the lack of communication," which are "overly burdensome to the United States Trustee, creditors, and the Court," as well as Attorney Strouse's lack of a Chapter 11 mentor to consult for guidance throughout the Chapter 11 proceedings.

As the U.S. Trustee stresses, while Attorney Strouse is experienced in representing clients in consumer bankruptcy cases filed under Chapters 7 and 13 of the Code, he has never before filed a bankruptcy case on behalf of a Chapter 11 debtor. Chapter 11 is a very different animal from Chapters 7 and 13. For one, a Chapter 11 debtor-in-possession—and, by extension, the

debtor's attorney—owe a fiduciary obligation to creditors. *See, e.g., In re Scott*, 172 F.3d 959, 967 (7th Cir. 1999) ("[t]he debtor-in-possession owes a fiduciary duty to his creditors"); *Raymond Pro. Grp.*, 421 B.R. at 903 ("Fiduciary duties also bind attorneys and other professionals employed by the debtor-in-possession."); *cf. In re Mack Industries*, 606 B.R. 313, 319–20 (Bankr. N.D. Ill. 2019) ("Neither chapter 7 debtors nor their counsel . . . owe a fiduciary duty to the bankruptcy estate. . . . There is no equivalent to § 1107(a) for chapter 7 debtors."); *In re Gutierrez*, 309 B.R. 488, 499 (Bankr. W.D. Tex. 2004) ("[In a chapter 11 case,] the obligations on both the client and counsel are substantially different from those in the chapter 13 context. A debtor in a chapter 11 case takes on the fiduciary duties and responsibilities of a debtor-in-possession, a legal entity exercising most of the powers of a trustee. The chapter 13 debtor, though he or she remains in possession of property of the estate, and has the authority to use, sell, or lease that property, still does not assume anything approaching the breadth of trustee duties that a chapter 11 debtor-in-possession does. . . . The principle fiduciary duties [in a chapter 13 case] (collection of funds set aside pursuant to the plan for distribution to creditors, distribution of those funds, review of claims, monitoring debtor performance for the benefit of the creditor body) are placed not on the debtor at all, but on the chapter 13 trustee.").

An attorney must be familiar with the fiduciary duties imposed by Chapter 11 of the Code, because "[i]t is the role of the *attorney* for the debtor in possession to make sure the debtor in possession understands its fiduciary obligation and acts consistent with that obligation." *In re N. Beef Packers Ltd. P'ship*, No. BR 13-10118, 2017 WL 10729025, at *6 (Bankr. D.S.D. Jan. 5, 2017) (emphasis in original).

Chapter 11 cases also impose additional administrative burdens on counsel—for example, the requirements to file monthly operating reports and to seek approval to employ professionals—that are not present in consumer bankruptcy cases. "[A]n attorney hoping to represent a Chapter 11 debtor must have more than just integrity; that counsel must also have a strong knowledge

of technical requirements under the Bankruptcy Code." *Vettori*, 217 B.R. at 245.

> In a Chapter 11 case, an attorney can provide competent representation to the estate only if the attorney is thoroughly familiar with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Bankruptcy, and especially Chapter 11 bankruptcy, is a highly specialized area of law. An attorney for a debtor in possession must have expert knowledge of bankruptcy law in order to achieve a successful result. Experience indicates that a business that files a Chapter 11 case, by definition, is already in trouble. . . . Only an attorney with expert knowledge of bankruptcy law can properly aid in the administration of the case.

*Id.* (quoting *In re Doors and More Inc.,* 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991)).

Attorney Strouse has failed to convince the Court that he is competent to handle the representation of these Chapter 11 debtors. As noted above, he made several mistakes in the debtors' petitions, schedules, statements, and monthly operating reports. And his unfamiliarity with Chapter 11 requirements—as well as the lack of a mentor to turn to for guidance—likely led, either in whole or part, to the debtors' failures to seek approval to use WaterStone Bank's cash collateral. This inexperience also may have inhibited him from providing effective prepetition counseling and from identifying potential problems at the outset of these cases, like the absence of tax returns, bank accounts, and formal record-keeping.[14] On this record, the Court cannot find that employment would advance the "efficient, expeditious, and economical resolution of the[se] bankruptcy proceeding[s]." *Harold & Williams Dev. Co.*, 977 F.2d at 910.

Attorney Strouse's performance in other cases filed in this district (Chapter 13 and 7 consumer bankruptcies) also gives the Court pause. "One of

---

[14] As another example, at the June 23 hearing, Attorney Strouse remarked several times that the debtors would be "filing a plan." But as the Court and U.S. Trustee have pointed out on numerous occasions, the debtors have not moved to jointly administer these cases, let alone to file a joint Chapter 11 plan. As the record presently stands, each debtor would need to file its own plan, which necessarily will create additional administrative burdens for the Court, creditors, and other interested parties.

the most efficient methods for determining whether an attorney has competence to be appointed Chapter 11 counsel is to look at the attorney's performance in previous cases." *Vettori*, 217 B.R. at 245 (citing *In re Slack*, 73 B.R. 382, 386–88 (Bankr. W.D. Mo. 1987) (denying application to employ Chapter 12 counsel, based on counsel's conduct in other cases, including his numerous failures to attend important hearings, leading to dismissal of cases, and failures to "make timely and sufficient filings of proposed plans of reorganization and other documents required for the processing of cases, with unfavorable consequences for his clients")). On more than one occasion in the recent past, Attorney Strouse has been required to appear and explain inaccuracies or other problems in documents filed with bankruptcy courts in this district. *See, e.g.*, Case No. 15-20691-kmp, ECF Nos. 60 and 73; Case No. 16-24985-beh, ECF Nos. 51, 52, and 56.

While every Chapter 11 lawyer of course must have a "first case," courts expect attorneys to approach such cases with diligent Code compliance, attention to detail, timely completion of required tasks, and most likely, under the guidance of more experienced counsel. Very little of that has happened in these cases so far. While the Court appreciates that the Ryans have a relationship with Attorney Strouse that goes back several years, that familiarity is not enough to meet the fiduciary obligations demanded by the Code.

In light of Attorney Strouse's conflict of interest and his lack of demonstrated ability in these Chapter 11 cases, the Court concludes that employment of Strouse Law Offices is not in the best interest of the debtors' estates and will not approve the debtors' applications to employ. In other circumstances, the Court may have considered approving Attorney Strouse's employment on the condition that he obtain the assistance of an experienced Chapter 11 attorney, but the existence of the conflict, compounded by Attorney Strouse's failure to recognize such a possibility and disclose it as required by Rule 2014, forecloses that option.

**B.    The U.S. Trustee's Motions to Convert**

For the second time in each of these cases, the U.S. Trustee has filed a motion to convert the case to Chapter 7, under 11 U.S.C. § 1112(b). Section 1112(b) of the Code provides for the conversion or dismissal of a Chapter 11 case, "for cause." Section 1112(b)(4) contains a non-exhaustive list of what constitutes "cause" for purposes of § 1112(b), which includes "unauthorized use of cash collateral substantially harmful to 1 or more creditors." 11 U.S.C. § 1112(b)(4)(D).

The party seeking conversion bears the initial burden of proving that cause exists by a preponderance of the evidence. *See In re Waterworks, Inc.*, 538 B.R. 445, 457 (Bankr. N.D. Ill. 2015) (citing *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)). Once the movant shows cause, dismissal or conversion is mandatory, unless the debtor can establish the exception enumerated in section 1112(b)(2):

> First, the debtor must specifically identify "unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2). The Code does not define "unusual circumstances," but the phrase "contemplates conditions that are not common in most chapter 11 cases."
>
> Second, the debtor must demonstrate (1) that a plan is reasonably likely to be confirmed within the statutorily required time, 11 U.S.C. § 1121(b)(2)(A); and (2) that the debtor had a "reasonable justification" for the act or omission constituting "cause" for conversion or dismissal, and the act or omission will be cured within a "reasonable time," 11 U.S.C. § 1121(b)(2)(B)(i), (ii).

*In re Aurora Memory Care, LLC*, 589 B.R. 631, 638 (Bankr. N.D. Ill. 2018) (internal citations omitted). If the debtor fails to meet this burden, the Court then must determine whether dismissal or conversion to Chapter 7 would be in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1).

The U.S. Trustee argues that "cause" for conversion exists under § 1112(b)(4)(D), based on the debtors' unauthorized use of WaterStone Bank's cash collateral. To prevail on this theory, the U.S. Trustee must establish not

only that the debtors used the bank's cash collateral without its consent or authorization from the Court (a fact that is not in dispute), but that WaterStone (or another creditor) suffered harm as a result, and that the harm was substantial.

The type of harm contemplated by section 1112(b)(4)(D) generally concerns a "diminution to the recoverable value of [a] creditor's collateral." *7 Collier on Bankruptcy* ¶ 1112.04[6][d] (16th ed. 2021). "If a debtor uses cash collateral without consent or authority from the court, a serious risk exists of immediate and irreparable harm to the financial value and opportunity of the creditor to recover from such cash collateral." *Id.* (citing *In re Three Partners, Inc.*, 199 B.R. 230, 237 n.9 (Bankr. D. Mass. 1995) ("The failure of [a debtor-in-possession] to seek cash collateral authorization (or obtain the necessary consents), when applicable, reveals a profound ignorance by that debtor of the responsibilities attendant to its status. In appropriate cases, such a failure should be considered in conjunction with the viability of a Chapter 11 case or the continuation of the debtor in possession.")).

As for the substantiality requirement, there is little case law defining the meaning of the term "substantially harmful." In one of the few cases to consider what constitutes substantial harm, the bankruptcy court in *In re Visicon Shareholders Trust* observed that "substantial" is defined as "considerable in importance, value, degree, amount, or extent." 478 B.R. 292, 314 (Bankr. S.D. Ohio 2012) (quoting *The American Heritage Dictionary* 1376 (4th ed. 2007)). The court concluded that the effect of the debtor's unauthorized use of cash collateral in that case rose to such a level of harm: the debtor used the cash collateral "to pay the numerous personal expenses of the insiders, to pay prepetition claims, to make unauthorized payments to professionals, to make mortgage and condominium association payments on [the debtor trust beneficiary's mother-in-law's] Florida condominium, to make the lease payments on [the debtor trust beneficiary's and her mother-in-law's] automobiles, and the payment of expenses for which no explanation was given." *Id.* These unauthorized expenditures—which either had no

demonstrable benefit to the estate or were made "in complete derogation of the bankruptcy priority scheme"—substantially harmed both the secured creditor who had an interest in the cash, as well as any unpaid unsecured creditors. *Id.*

In a less egregious example, the debtor in *Pena v. Manfredo*—a property manager who owned and managed over a dozen residential properties encumbered by deeds of trust with assignment of rent clauses—did not file a motion for use of cash collateral until six weeks after the petition date, by which time he had used $16,000.00 in cash collateral without authorization. No. 12-CV-01233-AWI, 2013 WL 4817581, at *1 (E.D. Cal. Sept. 6, 2013), *aff'd,* 582 F. App'x 744 (9th Cir. 2014). The secured creditors opposed the debtor's motion to use their cash collateral, in part because the debtor had failed to account for the rental income and expenses as to each individual property. *Id.* at *2. The bankruptcy court ordered conversion of the case under § 1112(b)(4)(D), finding that the debtor's unauthorized use of cash collateral was substantially harmful to at least one creditor. On appeal, the district court affirmed, observing: "Although some of the $16,000 went to business overhead and secured debt payment, 'there was apparently no effort to use rent collected from a particular property to pay the deed of trust encumbering that property.'" *Id.* at *6. In addition, the funds had not been segregated, and the debtor had not provided "an accounting of the precise expenditures of these funds." *Id.*

In contrast, the court in *In re Waterworks, Inc.*, concluded that the debtor's unauthorized use of cash collateral was not substantially harmful, and therefore not cause for conversion or dismissal. 538 B.R. at 460–62. In *Waterworks*, the movant-creditor held a prepetition security interest in the debtor's deposit accounts and accounts receivable (which did not continue post-petition), totaling about $150,000. *Id.* at 460. The debtor used these funds without authorization during the first two weeks of the case to pay its normal operating expenses; later, it exceeded its approved cash collateral budget to make an "emergency purchase of [a] replacement Bobcat during the height of the winter plowing season" (the debtor plowed and removed snow and ice from parking lots in the winter) to enable continued operations. *Id.* at 461. The

bankruptcy court observed that the debtor's deposit accounts and accounts receivable—on which the debtor had granted the movant a post-petition lien as part of an agreed cash collateral order—had increased by nearly $200,000 during the course of the case, and that the debtor had made adequate protection payments to the creditor totaling more than a third of its claim as of the petition date. *Id.* The court reasoned:

> It is therefore difficult for this creditor whose position has so improved in the course of the Chapter 11 case to demonstrate that it was harmed, let alone substantially harmed, by the Debtor's use [of] cash collateral to continue the operation of its business during the initial two weeks before its unopposed motion for use of cash collateral was presented or in the isolated instances where Waterworks exceeded its approved budgets.

*Id.* After considering the totality of the circumstances, the court found that the debtor's unauthorized use of cash collateral, which was limited to a few "isolated [occasions] whose limited effect benefited creditors as well as the Debtor," did not constitute cause for conversion. *Id.* at 462.

Here, the alleged harm to WaterStone Bank, according to the U.S. Trustee and Mr. Bruss's testimony, is the increase in the debts owed to the bank, plus the bank's inability to monitor the use of its cash collateral and ensure that funds are used for its benefit. The debtors argue that this does not constitute substantial harm, for several reasons. First, the debtors spent the money on repairs, insurance, and other regular expenses necessary for continued operations. Second, there is a large equity cushion in both of the properties. Third, the debtors have reached agreements with WaterStone regarding the use of its cash collateral and to provide adequate protection in the form of monthly payments (interest at the contractual rate plus one-twelfth of the 2020 real estate tax bill), plus a number of reporting requirements to ensure that WaterStone has oversight of the disbursement of the rent; as a result of these agreements, WaterStone withdrew its motions seeking either relief from the stay or adequate protection as to the debtors' real estate.

In these circumstances, the Court finds that any harm suffered by WaterStone Bank due to the debtors' unauthorized use of its cash collateral was not substantial. The debtors used the funds to improve and insure the real estate and to pay for regular operating expenses. The debtors' most recent operating reports, for May 2021, reflect positive net income. Rather than having posed an "immediate and irreparable harm to the financial value" of WaterStone's collateral, it is more likely that these expenditures improved the bank's overall position, by maintaining or increasing the value of the real property and facilitating the debtors' ability to continue collecting rental income. While the debtors should have sought permission before using WaterStone Bank's cash collateral, *cf. Three Partners*, 199 B.R. at 237 n.9 (a debtor-in-possession is obligated to seek court authorization or to obtain consent to use cash collateral "from the outset," and failure to do so "reveals a profound ignorance by that debtor of the responsibilities attendant to its status"), the debtors' unauthorized use, by itself, does not constitute cause for conversion under § 1112(b)(4)(D). Because the U.S. Trustee has not met his burden of proving cause under § 1112(b)(4)(D), the Court need not reach the question of whether the debtors have satisfied the exception of § 1112(b)(2), or whether conversion or dismissal would be in the best interest of creditors and the estate, and will deny the motions.

One final point is worth noting. At the beginning of the June 8 hearing, counsel for the U.S. Trustee suggested that an additional basis for conversion may exist, due to the debtors' gross mismanagement of their estates under § 1112(b)(4)(B). Counsel did not press this theory during the course of the evidentiary presentation or in closing arguments, so it's doubtful the debtors were given sufficient notice of the need to defend against such a claim, or the possibility that the Court would consider whether "cause" existed for any reason other than under § 1112(b)(4)(D). There is, however, evidence in the current record tending to support the U.S. Trustee's position.

These debtors have demonstrated an unawareness of their fiduciary duties as debtors-in-possession. They have a history of poor recordkeeping and

they lack prepetition tax returns, recent bank statements, and comprehensive accounting records (professional or otherwise). No accountant has been proposed for either debtor. Ryan 1000, LLC intends to realize the equity in its real estate by quickly selling its property in this "hot" market, but the debtor has not sought to employ a real estate broker. These circumstances do not portend an easy road to confirmation and successful reorganization.

Nevertheless, at this early stage—and assuming the debtors' valuations and income projections prove to be accurate—it is not a foregone conclusion that these cases are doomed to fail. *Cf. In re Attack Properties, LLC*, 478 B.R. 337, 344–45 (N.D. Ill. 2012) (bankruptcy court did not err in dismissing Chapter 11 case for "cause" based on its finding that the debtor had no reasonable likelihood of successfully confirming a plan of reorganization; "the judge concluded that further suspension of the creditors' rights in order to allow [the debtor] to reorganize would be futile, as there had been no progress in that direction, and there was little prospect of any future progress") (citing *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.")). Debtor Ryan 1000, LLC has begun informal discussions about selling its real estate in what all witnesses agreed is a favorable seller's market. If such a sale is realized, the profits would be sufficient to pay the claims of both debtors, as well as 100% of the unsecured claims filed in the Ryans' Chapter 13 bankruptcy. The debtors' plan-filing exclusivity period has not yet expired (although the end date is drawing near), and if the positive income trend reflected in the debtors' most recent operating reports continues, they should have sufficient cash on hand to sustain operations in the near term. The Court also is mindful that

> "[c]onversion or dismissal is a 'drastic measure' and the movant bears the burden of proving that the relief requested is 'warranted and not premature.'" Indeed, at least some degree of pre-petition mismanagement can be found "in virtually every insolvency case." Such conduct then must be viewed in light of the "philosophy of

chapter 11 [which] is to give the debtor a 'second chance' at business success."

*Waterworks*, 538 B.R. at 460 (internal citations omitted).

Given the debtors' lack of notice that the Court may consider any grounds for conversion or dismissal other than under section 1112(b)(4)(D), and "the principles of open access that guide the bankruptcy process and the need 'to allow debtors a fair opportunity to reorganize their assets,'" *id.* at 458, the Court will not reach the merits of any undeveloped and unpled arguments for the existence of "cause" at this point in time. Because the U.S. Trustee has failed to satisfy his burden of establishing cause for the reason alleged, the Court must deny his second motions to convert.

Cognizant, however, of the concerns expressed not only by the U.S. Trustee but also counsel for WaterStone Bank (and, to a lesser extent, Ms. Garcia) about the debtors' ability to move these cases forward while satisfying their obligations under the Code, and to aid in the expeditious and economical resolution of these cases, the Court will impose several conditions on these cases going forward. *See* 11 U.S.C. §§ 105(a), (d). Specifically, the Court will require the debtors to retain new counsel within 30 days (and correspondingly will extend the duration of the Court's interim cash collateral orders) and will set a status conference for shortly thereafter.

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED:

1. The debtors' applications to employ Strouse Law Offices as counsel (Case No. 21-21326-beh, ECF No. 44 and Case No. 21-21327-beh, ECF No. 37) are denied.

2. The U.S. Trustee's second motions to convert these cases to Chapter 7 (Case No. 21-21326-beh, ECF No. 39 and Case No. 21-21327-beh, ECF No. 32) are denied.

3. Debtors Ryan 1000, LLC and Ryan 8641, LLC each must retain new Chapter 11 counsel no later than **August 2, 2021**.

4. The Court will hold a telephonic status conference in both of these cases on **August 4, 2021 at 2:00 PM**. Dial-in information will be posted to the docket.

5. The interim cash collateral orders that the Court entered in both of these cases (Case No. 21-21326-beh, ECF No. 66 and Case No. 21-21327-beh, ECF No. 58) are amended as follows: In paragraph H(1), the date **July 8, 2021 is replaced with the date August 4, 2021.**

Dated: July 2, 2021

By the Court:

Beth E. Hanan
United States Bankruptcy Judge